The third case for argument is Norick v. Hays Companies. Mr. Spesiva. It's a perplexing one, Your Honor. May it please the Court, Counsel, my name is Chuck Spivak and I'm here on behalf of the appellant, Hays Companies. Your Honors, this appeal presents a very simple premise. In the fall of 2021, when Hays Companies informed Norick that it was no longer going to pay a share of the commissions on an account known as the sum of fire protection count, there was no obligation owed by Hays to Norick to continue to pay on that account which could be breached. As a result, the district court erred in granting summary judgment holding that there was a breach and ordering the Hays Companies pay damages as a result. As devoid in detail as the agreement which is the subject of the appeal is, that which we've referred to in the briefs as the 1994 memorandum, there's one thing that's for certain. For Norick to be paid on account, it has to have sold that account and it's undisputed in this record and this record is somewhat unique for summary judgment. It's undisputed in this record that the account which existed in September of 2021 when payments were ceased and on which Norick demanded that it continue to be paid was not the same account that Norick sold in May of 2023. But you're making the argument that's new on appeal. I am not, Your Honor. Where was it preserved? This argument was made on appeal at Appendix 340, at Appendix 284, at Appendix 296 and 97, and in Appendix 329 and 30. I'm trying to write these numbers down. I'm sorry, Your Honor. You're rattling them off. Well, some of them are in my brief, but I'll slow down. This argument was made at the trial court in the briefing on summary judgment at Appendix 340, at Appendix 284, at Appendix 296 to 97, and at Appendix 329 to 30. Isn't it also disputed that your client continued to pay Norick? Norick, I may be mispronouncing another name, but after the ownership change and that there were internal emails that just repeatedly said, hey, we're stuck with it, even after the ownership started to change, and I realize there are several different key events in there. But my understanding is the checks continued to be transferred up until the very end. There were two sales to private equity, Your Honor, and the record is undisputed that Hayes Companies continued to pay Norick after the first sale to private equity. The payment ceased after the second sale to private equity. But I posit, Your Honor, that Your Honor's question, with all due respect, and the arguments made by counsel for Appellese, again with all due respect, is irrelevant as it's a misstatement of Minnesota law. For over 100 years in Minnesota, the law has been that excuse of performance one time of a contract doesn't mean that you've waived that performance every other time. And so... What's the performance that would be waived here? Well, the performance that was waived here was that they didn't sell. So the argument... Well, if they had already sold once. I mean, I take your point, I guess. Yeah. So the point is, Your Honor, that the law in Minnesota, in colloquial terms, says that, all right, these people may have been friends. And when the first sale to private equity came along, you could make the argument that, look, this first private equity firm, they had their own broker, Lockton, and they came to us and said, Hays, you know, we like you, but every company we acquire, we put with a competing broker, Lockton. And at that point in time, Norick had no contact with Summit Fire Protection at all, by his own admission. They didn't even know what to call it. They called it the sprinkler company. But the Hays people then said, with that first sale to private equity, hey, you know, give us a shot, let us convince you, and they did. And the business stayed with Hays. Now, this contract, this 1994 memorandum, doesn't require that I introduce a prospect to you. It doesn't require that I somehow have a social engagement where you can talk to each other. It requires that for Norick to be paid, it has to have sold that account. And the records then disputed that with the first sale to private equity, Norick did not make that sale. Nor did Norick create a situation that made it easier for Hays to sale. Hays had to overcome the presumption of a different broker, as opposed to benefiting from the presumption of the existing relationship. You can say that, but I mean, that's, you have so dictated Minnesota law to us, it's just, I don't agree with anything you argue about Minnesota law. It's all up to, it's all up to a, first of all, if it's ambiguous, it's a whole new ballgame. And there couldn't be more, there couldn't be greater ambiguity to me than the word sell here. If that's the case, Your Honor, then we're more than happy to have this court remanded back to the trial court and let's have a trial on these ambiguous facts. And if that's what you conclude. No, an ambiguity is normally for a jury, but not always. It can be sufficiently undisputed, which the district court here found by performance. And the district court made an erroneous assumption, and Your Honor would do the same thing if you were to agree with it. Because again. What's the erroneous assumption? The erroneous presumption is that if you excuse performance once, you will excuse the same performance again. But if the term in the original agreement is ambiguous, the conduct of the parties is relevant to interpreting what that term means. Isn't that the law? Right. So the word that's ambiguous is. Excusing performance demonstrated that your theory about the new account was not the party's understanding. Therefore, the second sale versus the first sale does not trigger the principle of Minnesota law you're relying on. I respectfully disagree, Judge Lopen. I know you do, but I don't, I just don't see. More important, I believe the Minnesota Supreme Court disagrees with you. The performance that's required by NORC in order to earn the commission is that it must make a sale. No, it had to have originated the account. There's no, the word origination appears nowhere in this agreement, Your Honor. Origination was an interpretation given to the word sale, but the agreement. By both parties. No, not at all, Your Honor. The record is absolutely clear that Hayes disputed on every step along the way. Wait a minute, when? I'm talking about in 1994. I agree. In 1994, from this point forward, Hayes disputed the idea that sales means origination. If you look at the record, the Hayes employees testified that sales means something more than just bringing something into the door. It's an ongoing daily endeavor. You make calls. You make sure the people are happy with what you're doing. But they still thought they owed the money at that point, right, and continued to make the payment. I mean, it's not crystal clear that they were disputing that at that point, was it? I mean, I don't understand why they were writing these tens of thousands of dollars in checks if it was clear that, if your interpretation was correct. Now, I get your point that Minnesota law may exclude it. Whether I agree with that or not, I'm not sure yet, but. So Norm Hagen, Rick Glasgow, Bill Merchant, and Jim Hayes were lifelong friends, and this was a relationship between friends. And even though there was that first situation where the new account was not something that Norrick had sold, the fact that Hayes continued to pay Norrick the commission on that account does not mean that Hayes could never in the future say that if there was another situation where no sale had been made by Norrick. What specifically makes it a new account in your way of thinking? Is it the change of ownership? Absolutely, Your Honor. Is it the change of ownership without the sort of negotiation of, hey, we want to send it elsewhere, and then Hayes comes back and says, no, stick with us. Is that a necessary element, or is it as soon as the ownership changes, then you have a new account? Sure do. And what case stands for that proposition? These are corporate parties. The ownership doesn't matter. I don't know how I can possibly respond to that, Your Honor. You don't sell to juridic entities. You sell to individuals. Not necessarily. And the new owners were the ones that made the decisions. Okay, that proposition, you don't sell to, I'll convert it to business entities. You sell to the people that are involved in the entities. Is that true? And again, I'm asking for cases here, and I didn't hear one last time. And there may be them. I just, what's the case that says that? Your Honor, the case would be the one that I would cite you from the Minnesota Supreme Court in our reply brief that talks about the situation where one excuse of performance doesn't constitute an excuse of the same performance over and over and over again. That's a different proposition than the one you just cited to me. I don't know that there is a case. Are you arguing it's a personal services contract here? No, Your Honor. I'm talking about a new entity with new owners that have a relationship with a different provider than the one that Norik had brought into. So you're saying the relationship with the new provider is a necessary element of it. It's not just being acquired by new owners. It's being acquired by new owners that have their own broker. No, what I'm saying is the new owners that have their own broker is what takes this out of there just being a fact question and makes it one where judgment needs to be entered in favor of Hays Companies. If we just had new private equity owners, and the record is clear that the Norik people had nothing to do with these new private equity owners, and in the insurance business every year you have to do renewals. And so if it was Hays Companies that dealt with these new owners, then there might be a fact question as to by how much the new owners were influenced by the work that had been done for its newly acquired employees. But in this case, the record is clear. There's no dispute that these new owners came in and said, we have a relationship with a different broker. And the only entity that did the sale, not origination. There's nothing in this contract that talks about origination. The only entity that did the sale was Hays Companies. Hays Companies served the new owners on staying with them as opposed to going with their new broker. Is there a new sale? These are annual policies. They sure are. Is there a new sale every year? Every year the broker has to reestablish its relationship with the client. That's just the way the insurance industry works. So, Your Honors, I don't want the second part of our argument to go untalked about. Because while I think this first one is dispositive, there's no contract here that applies because there was no account that was subject to a contract in September of 2021. But if there was, then Minnesota law is clear that if the contract is of indefinite duration, it is terminable at will. What about an implied duration? I'm sorry? What about the response to that argument that there's an implied duration in this arrangement? Clearly an erroneous assumption that there's an implied duration. Every contract would have an implied duration if the argument was that, well, the contract will exist until you decide you're not going to perform on it anymore. It would make the idea that a contract of indefinite duration is terminable at will a legal nullity if you were going to infer into every contract that it does have an implied duration because some party could just simply stop performing the contract. And none of the case law deals with that. The Lemerue case that they cite all had three specific items in it that could be considered an express duration. The LeGrand Port case had a clearly implied duration because the pig, which was the subject of the contract, everyone knew at some point in time was going to die. The case that's most on point is the Waterford case. And in Waterford, as the Court will recall, the facts were that Waterford let Northfield annex 20 acres of Waterford's property in return for Northfield's promise to pay Waterford some of the tax revenue. Waterford performed. It transferred the 20 acres forever. But after a time, Northfield stopped paying. That sounds pretty familiar to the facts of this case. Waterford cried foul. But in that case, the Court got it right. The Court said because the agreement did not unambiguously express perpetual duration, it was deemed to be indefinite and terminable at will. And this idea that the duration has to be unambiguously expressed in the contract itself, not inferred out of the ether, is Minnesota Supreme Court authority in the Glacial Plains case cited in our opening brief at page 22. There is no duration unambiguously expressed in the 1994 memorandum. Nowhere. So even if it did apply to the 2021 version of the summit account, that 1994 memorandum was terminable at will. Finally, Your Honor, I'm reluctant to even mention this because I think the undisputed facts and the law clearly support a reversal and the entry of a judgment in favor of Hayes is a matter of law. But should this Court conclude that the law says otherwise, that at the very least there are fact questions that need to go to a jury? What was the intent of the parties as to the obligations under the 1994 memorandum after the deaths of the principals? And whether NORC has sufficiently performed its sales part of the bargain with summit's new owners to justify a conclusion the contract existed, requiring the continued payment to it of the shared revenue from the summit account? Thank you, Your Honors. Ms. Markowitz? May it please the Court, my name is Sharon Markowitz and I represent Apolline NORC. I'd like to address what I think is at the core of Hayes' confusion on the termination at will issue. When it comes to contract duration, there are three options. Definite, indefinite, and perpetual duration. The issue in this case is whether the contract had a definite or indefinite duration. We argue that it has a definite duration. It can end upon certain events. That was also the issue in Lamereau and LaGred. The cases that Hayes cites, including Glacial Plains and Waterford, all deal with the question of whether the contract had a perpetual or indefinite duration. The analysis of that question is very different. When the question is whether the contract has a perpetual duration, courts look to whether there are unambiguous expressed terms in the contract indicating that the parties wanted the contract to last forever, perpetually. Expressed terms are the beginning and the end of the analysis of whether a contract is perpetual duration. Implied terms do not matter. And I think it's for that reason that Hayes focuses so much on expressed terms and the absence of expressed terms in this case. But the analysis is entirely different when one party argues, as we do, that the contract has a definite duration. In that case, the court looks to whether there is a definite duration that is expressed or implied. The implied terms really do matter. And you see, for instance, that Lamereau and LaGred both find implied definite durations. What's the definite duration in this contract? For as long as the parties have shared clients, and as it relates to this particular moment in time, it would be for as long as Hayes continues to service the SoMuch account, which is the last shared client. And how does the shared client arrangement survive changes in ownership? The contract does not address it. It gives absolutely no indication that a change in the client's ownership would change who constitutes the seller and the marketer of the account. The party's conduct tells us a great deal, though. Contrary to what Hayes has said many times, there were actually three private equity sales. I believe they were in 2015, 2017, and 2021. After those two first private equity sales, Hayes continued to pay more on the SoMuch contract. They paid, I think, over a million dollars during that time. They also had over half a dozen emails that said, it's really frustrating that we still have to pay more, 50% of our revenue on the SoMuch account, but we have to do it because that is the agreement. They also attempted to modify the contract by giving themselves a bigger percentage of the revenue split after one of the private equity sales. It defies reason that they would attempt to modify a contract if they believed that contract required nothing of them after the private equity sales. What would have been the proper way for Hayes to terminate the contract? They can stop servicing the SoMuch account. That actually brings me to Lamereau, which deals with this exact issue. Lamereau decided that the contract had a definite duration, and it did so for two independently dispositive reasons. The first was that the contract expressly terminated upon events A, B, and C. We don't have express terms like that here. We're not relying on that portion of Lamereau. But independently dispositive to the Lamereau decision was that the contract impliedly terminated upon event D, a different event than what the express terms address. And that event was the discontinuation of meat processing. So in that case, the plaintiff invested in the defendant's meat processing technology, and the defendant agreed to pay a royalty on that meat processing. And the court said, The choice to process meat, which triggers the contractual obligation to pay, rests entirely at defendant's discretion. Thus, under Minnesota law, the contract is not indefinite. No at-will termination provision will be added by the courts. The same is true here. The choice to continue servicing the summit account, which triggers Hayes' obligation to pay Norrick, rests in Hayes' discretion. As a result, the contract is not indefinite in duration. It's definite. And as a result, this court should not impose a termination at-will provision on the contract. I'm happy to answer any other questions you have. Actually, there is one more thing I wanted to address, the waiver issue. Hayes argues a lot about how the waiver of performance once doesn't waive it for all time. I don't disagree with that. We have never argued that Hayes waived its rights. Rather, we argued that their conduct, particularly when combined with their own internal communications, tells us what the ambiguous term sell means. Just as an aside, we agree that the term sell is ambiguous, that there's more than one reasonable interpretation. But the argument that Hayes makes on appeal, for the first time on appeal, they didn't argue it to the district court, is not one of those reasonable interpretations. There is nothing in the contract that suggests that a client's change in ownership changes who constitutes the seller of the account. There's also nothing, by the way, in any of Hayes' witnesses' testimony that supports that view. Not a single one of them said that. There's also nothing in the internal communications that indicates that. This is a completely made-for-litigation position, actually a made-for-appeal position. But as to waiver, what we're arguing is not that anyone waived their rights, but that we know that the word sell does not imply ongoing communication with the client because of the party's conduct and their internal communications. Would you address opposing counsel's first argument about the state of Minnesota law and its application to this case? The state of Minnesota law on the waiver. The condition or the current status of Minnesota law that he cited to us about how Minnesota would interpret the conduct of the parties here. I think his point, as I recall, was that the conduct of the parties by waiving its rights once doesn't waive those rights later. It's completely inapplicable. We've never argued waiver. This is not a waiver issue. This is a contract interpretation issue. And the Eighth Circuit, in particular, has been very clear that when it comes to interpreting an ambiguous contract, the party's course of conduct is the most strong evidence we have of what a contract means. That's what we're arguing here. The party's conduct is evidence of what the contract means, not that he's ever waived its rights. So that's completely inapplicable. I'm happy to answer any other questions you have. Otherwise, I'm happy to give you seven minutes of your lives back. Thank you. I have very little time left, so I will be very brief. The issue is a waiver. The issue is whether there was the performance of the terms of the contract. Our argument is that Norick did not perform the terms required of it, of his contract, as of September 2021. It also hadn't performed the terms of his contract previously. Although, Your Honor, as you point out, we did continue to pay them after that. The entire argument with regard to whether there was performance or not rests on the fact that that continued payment needed to be made, continued to be made. Yet the Minnesota Supreme Court in the Inland Products case and the Shotwell v. C.O.D. case has made it clear that an acceptance of a party to a contract's failure performance once does not constitute an acceptance of that party's repeated failure to perform in the future. So Hayes was well within its contractual rights to say, enough is enough. Norick has not performed its terms under the contract and it no longer needed to be paid. They only failed to perform if it was a new account, right? The failure to perform was that it did not sell the new account. Norick had to sell. It did that in 2008. It didn't do that in 2017, and it did not do that in 2021. You're saying that, I gather you're saying every year because that's the way brokers do business in Minnesota, every year you have to reestablish. You have a new account and you have to have something with this shared term. That's exactly what's in the record, your honor. The people who sell for a living testified in the record in this matter. We have a series of transactions with payments consistent with the 1994 memorandum for, what, 24 years. And again, your honor, just because they accepted non-conformance with the contract once, they didn't sell once, doesn't mean they had to accept their failure to sell over and over and over again. Are you arguing that sell is not ambiguous, unambiguous? Oh, I'm saying that if it's ambiguous it's fine. But the only interpretation that can be given to it consistent with Minnesota laws is sales means something other than bringing an account in 13 years ago and watching the ownership change. Why under Minnesota law? Why was that case under Minnesota law? Right. I mean what tells me that sale can't mean that? I don't know that there's Minnesota law that defines what goes into being a sales person. My argument would be that this record either establishes that you have to do something to convince the new owners to buy from you and not from who they would normally buy from. Or if nothing else, it's up to the jury to decide what the ambiguous term sale means in this context. But not for the trial court at the summary judgment level to say sale can only mean one thing because I'm interpreting course of conduct in a manner inconsistent with Minnesota Supreme Court law. Thank you, Your Honors. Well the case has been thoroughly briefed and argued and the unusual contract situation. We'll take it under advisement.